## SOUTHERN MARYLAND ELECTRIC COOPERATIVE, INC. *v.* THE TRAVELERS INSURANCE COMPANY

[No. 1463, September Term, 1981.]

*Decided July 12, 1982.*

The cause was argued before GILBERT C. J., and WILNER, J., and EUGENE M. LERNER, Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Patrick M. Pilachowski,* with whom were *Earle K. Shawe, Stephen D. Shawe* and *Shawe & Rosenthal* on the brief, for appellant.

*Alan N. Gamse,* with whom were *Thomas J. S. Waxter, Jr.* and *Semmes, Bowen & Semmes* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

In October, 1961, appellant (SMECO) purchased a group life insurance policy, for the benefit of its employees, from appellee (Travelers). Effective September 30, 1979, SMECO discontinued the policy, replacing it with insurance from another company.

The Travelers policy provided for both term insurance, paid for by SMECO, and "paid-up" insurance, paid for by the insured employees. At some point, a dispute arose as to whether, upon termination of the group policy, the SMECO employees were entitled to discontinue their "paid-up" insurance and receive from Travelers the respective accumulated cash surrender values thereof, or whether such entitlement arose only upon termination of their employment with SMECO. SMECO, presumably on behalf of its employees, asserted the former; Travelers maintained the latter.

The dispute involved the validity and interpretation of the insurance contract in the light of certain statutory provisions. There are, of course, a number of avenues by which that dispute could have been judicially resolved, but SMECO chose none of them. Instead, it filed a complaint with the State Insurance Commissioner, invoking his authority under Md. Code art. 48A, § 55(2)(iv) to revoke or suspend an insurer's certificate of authority if the insurer "[w]ithout just cause unreasonably refuses or delays payment to claimants of the amount due them."

After a hearing on the matter, a hearing examiner for and on behalf of the Commissioner concluded that, although apparently authorized by the insurance contract, Traveler's position was contrary to law — in particular art. 48A, §§ 414, 417, 418, and 435. He therefore declared that its refusal to pay the cash surrender values to the requesting employees constituted a violation of § 55 (2) (iv), and, "in lieu of a statutory penalty" under § 55A of art. 48A,[1] ordered Travelers to permit the SMECO employees to "cash surrender their policies."

Travelers filed a timely appeal to the Baltimore City Court which, on August 25, 1981, reversed the Commissioner on two grounds. The court first found that the dispute involved "a legitimate legal issue as to the meaning of an insurance policy," and that § 55, from which the Commissioner derived his jurisdiction in the matter, was an inappropriate basis or mechanism for resolving that issue. Second, it said, "even if he did have jurisdiction here, I think he has misconstrued the policy."

SMECO is now the appellant, arguing that whatever interpretation may be given to the language of the insurance contract, the obligation to permit the employees to terminate their "paid-up" insurance and receive the cash surrender value is required (1) by statute, (2) by common law, and (3) by equity.[2] We disagree and shall affirm. We

---

1. Section 55A permits the Commissioner, in lieu of or addition to revocation or suspension of a certificate of authority, to impose a civil penalty of from $100 to $50,000 for each violation.

2. SMECO's standing to make the initial complaint to the Commissioner, to intervene in the appeal before the Baltimore City Court, or to maintain

believe that the Commissioner misconstrued the contract and the substantive statutory requirements, and, at least for that reason, he exceeded his authority under §§ 55 and 55A.

## (1) *The Insurance Contract*

The policy in question is labeled and denoted throughout as a "group policy." It was issued to SMECO, as an employer, and insured the lives of SMECO's employees for the benefit of those persons designated by the respective employees. The employees did not receive the policy itself, or even a copy of it; they received only a "Certificate of Insurance," referring to the "Group Life Policy" and attesting to their being insured under it.

The policy afforded an aggregate amount of life insurance (*i.e.,* death benefit) for each SMECO employee equivalent to approximately double his annual salary, up to a maximum of $20,000. That level of insurance was to be provided by a combination of "paid-up" and term insurance. Each participating employee could purchase "paid-up" — *i.e.,* ordinary or whole — life insurance by contributing $1.00 per month per $1,000 of *total* insurance. The amount of "paid-up" insurance that he received for that contribution was set forth in a table included in the policy, and was dependent upon his age. The difference between the amount of "paid-up" insurance so purchased by the employee and the aggregate amount to which he was entitled under the policy was supplied by term insurance paid for by SMECO. The "group paid-up life insurance" purchased by the employees accrued a cash surrender value, also set forth in a table and based upon the age of the employee.

The policy anticipated the possibility that it might one day be discontinued and that from time to time the covered employees might retire or otherwise leave SMECO's employ; and it contained a number of provisions dealing with those

this appeal has not been challenged by Travelers. In the absence of such objection, we shall assume SMECO's standing for purposes of this appeal in order that the underlying controversy be put to rest.

eventualities. In the section dealing with the "group term life insurance," the policy provided (with certain exceptions and subject to certain conditions) that if an employee's term insurance was terminated through discontinuance of or amendment to the policy *or* by reason of his leaving SMECO's employ, he could convert that term insurance to an individual insurance policy.

With respect to the "paid-up" insurance, three provisions are particularly pertinent. The section dealing with discontinuance of the policy provided that such discontinuance "shall not affect the Paid-up Life Insurance, if any, previously purchased for any Employee hereunder and in force at the date of such discontinuance." The policy also made clear, however, that "[a]fter the Term Life Insurance on his life shall have terminated" (as well as under four other conditions), the employee may not purchase any *more* paid-up insurance. Finally, the policy contained a section setting forth the circumstances under which an employee could surrender his "paid-up" insurance and demand a cash payment in lieu thereof. That section provided, in relevant part:

"Upon receipt by the Company of the written election of a former Employee, made

(a) after discontinuance of premium payments for his Term Life Insurance, except in the case of a Retired Employee, *and*

(b) *after termination of his employment with the Employer,* and

(c) not earlier than One year from the date last worked in the event that he shall have been continuously disabled from the date of termination of employment,

to receive, in lieu of the Paid-up Life Insurance in force on his life, the cash value of such Insurance, the Company will pay such cash value to him.

If the amount of Paid-up Life Insurance in force on the life of an Employee is less than One Hundred Fifty Dollars — and either his Term Life Insurance

and his employment shall have terminated, or his Term Life Insurance shall have terminated and this policy shall have been discontinued — the Company may, at its option without election by the Employee, but without any obligation so to do, cancel his Paid-up Life Insurance and pay to the former Employee the cash value of such Insurance. . . ." (Emphasis supplied.)

These various provisions, read *in pari materia* with each other, establish two important things with respect to the "paid-up" insurance. They first establish that, unlike the term insurance, the "paid-up" insurance actually in force at the time was not affected by a discontinuance of the master policy. Although the employee was precluded from adding to his "paid-up" insurance following such discontinuance, what he had at the time remained in full force and effect. It was not terminated and there was no requirement that it be converted into another policy. All of this is also reflected in the Agreement providing for the discontinuance of the policy signed by SMECO and Travelers on September 28, 1979.

The second point made clear from these provisions emanates from the first. Because there was no automatic termination of the "paid-up" insurance, the policy set forth the conditions under which that insurance may be "surrendered" and the cash surrender value demanded. Discontinuance of the master policy is not one of those stated conditions, however; and it does not appear that the omission was inadvertent. Cancellation of the "paid-up" insurance and payment of the cash surrender value upon termination of the master policy was provided for, but only where the amount of "paid-up" insurance involved was less than $150; and even then the option to cancel was given to Travelers, not to SMECO or its employees.

It seems clear to us from these provisions that, in terms of the contract itself, there is no obligation on the part of Travelers to accept surrender of the "paid-up" portion of the insurance and pay out the cash surrender values merely because the master policy has been discontinued. The

employees may surrender that insurance upon termination of their employment with SMECO; but until then, it remains in effect.

## (2) *Statutory Requirements*

The State Insurance Code, art. 48A, is divided into forty subtitles. Subtitle 23, captioned "Life Insurance and Annuities," consists of sections 386-416. It applies, according to § 386, "to contracts of life insurance and annuities, *other than* reinsurance, *group life insurance* and group annuities." (Emphasis supplied.) Subtitle 24, consisting of sections 417-436B, is captioned "Group Life Insurance"; each of its sections applies expressly to a group life insurance policy — a policy "insuring the lives of more than one individual. . . ." Section 417 (a).

The Insurance Commissioner, as noted, found that Travelers' position contravened the requirements of §§ 414, 417, 418, and 435 of art. 48A. The company's response, which we think is a correct one, is that § 414, which is part of subtitle 23, is not applicable to a group life insurance policy, and that the record fails to support any violation of the other sections.

Section 414 of art. 48A is Maryland's enactment of the Standard Nonforfeiture Law. It provides, in relevant part (subsection (b)), that "except as set forth in subsection (m), of this section," no policy of life insurance may be issued or delivered in Maryland unless it contains certain provisions, among which is that "upon surrender of the policy [within a certain period of time] the insurer will pay, in lieu of any paid-up nonforfeiture benefit, a cash surrender value of such amount as may be hereinafter specified." Subsection (m), however, tracks the exceptions of § 386 and provides expressly that "[t]his section shall not apply to any. . . group insurance. . . ."

SMECO seeks to waive aside subsection (m) (and § 386) with the bald assertion that the "paid-up" insurance provided for in the policy is not group insurance. But it clearly is group insurance. Aside from the ubiquitous statements

throughout the policy that it is "group life insurance" it certainly falls within the meaning of § 417(a), quoted above — a policy insuring the lives of more than one individual — which is the closest our statutes come to a generic definition of the term. It also comes within the definitions most commonly given to the term by the courts,[3] and is exactly what is encompassed in § 418 of art. 48A: "The lives of a group of individuals may be insured under a policy issued to an employer. . . which employer. . . shall be deemed the policyholder, to insure employees of the employer for the benefit of persons other than the employer. . . ." By reason of the policy, including the provisions for "paid-up" insurance, being "group life insurance," the requirements of § 414 are inapplicable to it.

The Commissioner acknowledged that the policy (including the "paid-up" insurance part of it) was a group life policy when it was issued, but found that it ceased to comply with the statutory requirements for a group policy when it was discontinued. His theory, more precisely, was as follows:

> "Article 48A, Section 418 provides: 'The lives of a group of individuals may be insured under a policy issued to an employer, or to the trustees of a fund established by an employer, which employer or trustees shall be deemed the policyholder . . . subject to the following requirements: (1) The employees eligible for insurance under the policy shall be all of the employees of the employer, or all

---

**3.** See *Hofeld v. Nationwide Life Insurance Company,* 322 N.E.2d 454, 457 (Ill. 1975): "Group insurance policies are those issued by insurance companies to a group policyholder, such as an employer, association or union. Certificates are then issued to the participating insureds, such as employees or members. The master policy is the primary contract and must first be looked to in construing group insurance policies." See also *Mutual Benefit Health & Accident Association of Omaha v. Bullard,* 120 So.2d 714, 720 (Ala. 1960), quoting from *Protective Life Insurance Company v. Moore,* 153 So. 751 (Ala. 1934); *McFarland v. Business Men's Assurance Co.,* 124 S.E.2d 432 (Ga.App. 1962); *Land v. West Coast Life Insurance Co.,* 270 P.2d 154 (Ore. 1954); *Crawford v. Metropolitan Life Insurance Co.,* 167 S.W.2d 915 (Mo.App. 1943); *and cf. Simpson v. Phoenix Mutual Life Insurance Company,* 247 N.E.2d 655 (N.Y.), reh. den. 252 N.E.2d 864 (N.Y. 1969). Compare *Ohrel v. Continental Casualty Company,* 350 A.2d 310 (N.J. Super. 1975); *Legler v. Meriwether,* 391 S.W.2d 599 (Mo.App. 1965).

of any class or classes thereof determined by conditions pertaining to their employment.' The insurance policy in question no longer meets the statutory conditions for a 'group insurance policy' in Maryland. When the group policy was discontinued in September 1979, those workers already enrolled into the group plan could retain their coverage. However, new employees could not participate in the group policy and therefore were excluded from membership in the class of eligible employees."

The fallacy in this reasoning, also advanced by SMECO, is evident. Section 418 has to be read in context with § 417, which really is the operative controlling regulation. Section 417 precludes a group policy from being "delivered in this State" unless in compliance with the balance of the subtitle, including § 418. When the policy in question was delivered, however, it was in compliance with the law; and, indeed, the record shows that the Commissioner approved the policy at that time. Discontinuance of the policy by SMECO cannot make that which was lawful, unlawful, or cause new terms to be engrafted onto the policy by operation of law. The policy, when issued, validly prescribed the limited circumstances under which Travelers would be obligated to pay out the cash surrender value on the "paid-up" insurance; and neither SMECO nor the Commissioner can unilaterally amend the policy so as to expand those circumstances merely because SMECO has exercised its option to terminate the policy.

The nonforfeiture provisions applicable to the policy in question here are not those set forth in § 414, but rather those stated in §§ 434 (conversion on termination of employment or eligibility) and 435 (conversion on termination of coverage). In the context of the present dispute, § 435 is most pertinent. It provides, in relevant part, that "[t]he group life insurance policy shall contain a provision that if the group policy terminates ... every person insured thereunder at the date of such termination whose insurance terminates ... shall be entitled to have issued to him by the

insurer an individual policy of life insurance. . . ." Contrary to the finding of the Insurance Commissioner, the record reveals no violation of that provision. The "paid-up" insurance, as noted, was not terminated or otherwise affected (except to preclude additions to it) by discontinuance of the master policy; and, with respect to the term insurance that *was* terminated, the conversion option was provided.

We are referred to no appellate decisions anywhere in the country precisely on the points in question here. *See, however, Kelley v. Aetna Life Insurance Company,* N.Y. Supr. Ct., N.Y.Co., Index No. 9539/72, March 6, 1973, and *Uniform Tubes, Inc. v. The Travelers Insurance Co.,* Ct. Comm. Pl., Montg. Co., Pa., Eq. No. 71-13685, Aug. 9, 1973, two *nisi prius* decisions reaching the same conclusions we do.

The Commissioner's determination that the policy violated §§ 417 and 418 finds no support whatever in the record. Nor do we find any violation of common law or equitable principles, as asserted by SMECO. The simple fact here is that, by virtue of the extraordinary inflation and abnormally high interest rates that have prevailed for the past several years (and which SMECO's employees evidently believe will continue into the future), the "paid-up" insurance provided for in this policy, initially written in 1961, has ceased to become an attractive investment. That is not license to rewrite a valid contract, however.[4]

> *Judgment affirmed; appellant to pay the costs.*

---

4. The conclusions that we have reached on the substantive issues of contract and statutory interpretation make it unnecessary for us to address the secondary question of whether the Commissioner's order was appropriate, in any event, under §§ 55 and 55A. We shall do no more in that regard than to declare the obvious: if an insurer declines to make payment in the good faith belief that such payment is not required under the contract (or under the law), its failure to make the payment is not unreasonable or "without just cause"; and if the Commissioner were to find otherwise, his decision would be arbitrary and capricious.